[Crim. No. 5245. First Dist., Div. Two. June 22, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. PEGGY ROSENFIELD et al., Defendants and Appellants.

Jack K. Berman and Burton Marks for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

SHOEMAKER, P. J.—Defendants Peggy Rosenfield and Terry McGuire were indicted on September 24, 1964. The first three counts of the indictment accused said defendants of burglarizing the apartment of one Charles Payton, robbing Payton and assaulting him with a deadly weapon. The fourth and fifth counts of the indictment accused defendant Rosenfield of burglarizing the apartment of John Capiti and assaulting Capiti with a deadly weapon.

Upon motion, the court severed the final two counts.

The trial proceeded on the first three counts of the indictment. The jury found both defendants guilty of burglary and robbery and, as to the third count, found both defendants guilty of the lesser included offense of assault by means of force likely to produce great bodily injury. Both defendants moved for a new trial, and the court denied said motions as to the burglary and robbery and dismissed the third count of the indictment. Judgment was entered in accordance with the verdict,[1] and both defendants filed notice of appeal therefrom.

The evidence adduced on the part of the People may be summarized as follows: At approximately 8:30 or 9 p.m. on August 13, 1964, Charles Payton entered the Booker T. Washington Hotel, which is located on Ellis Street in San Francisco, and took a seat at the bar. He ordered a drink for himself and subsequently ordered a drink for defendant Rosenfield. Payton talked with her until close to midnight and during this time defendant Rosenfield repeatedly solicited Payton for an act of prostitution. Ultimately he agreed to pay her $10 if she would accommodate him at his apartment.

---

[1]Although defendants do not raise this point, it may be noted that no question of double punishment is here presented. The record discloses that the trial judge sentenced defendants for both burglary and robbery, but stayed execution of sentence on the robbery count pending appeal and during the service of sentence on the burglary count, with said stay to become permanent when the sentence on the burglary count had been completed. In *People* v. *Niles* (1964) 227 Cal.App.2d 749, 754-756 [39 Cal.Rptr. 11], the sentencing procedure here utilized was considered and held not to amount to double punishment within the proscription of Penal Code, section 654.

Payton then drove her directly to his apartment in the Hunters Point area, arriving there at approximately midnight. Payton had had three drinks containing alcohol and defendant Rosenfield had had one. Upon arriving at the apartment, Payton fixed drinks for himself and defendant Rosenfield and then offered to give her the $10 outright if she were that desperate. He also showed her some money which he had in the apartment but told her that he needed it to pay his bills. After he had paid her $10, defendant Rosenfield indicated her intention to proceed with the act of prostitution, and they had intercourse. He then drove her back to the Booker T. Washington Hotel.

Payton denied that he had offered to pay defendant Rosenfield any additional sum by check and stated that he did not have a checking account at the time. He further denied that he had struggled with her, forced her to remain in the apartment or taken any money from her. He noticed that she was very particular about her hair but did not know whether she was wearing a wig.

Payton left defendant Rosenfield at the Booker T. Washington Hotel at approximately 2 a.m. He drove around the block, had a cup of coffee, and returned to his apartment at approximately 3 a.m. He went to bed and fell asleep but subsequently awoke to find that his head and face were bleeding. Defendant McGuire was standing over him with a gun, and another man with a gun was standing nearby. McGuire struck Payton with the gun and demanded to know where his money was. When Payton asked what money he meant, McGuire replied, ''The money you took from the girl that you had here.'' Payton denied having taken any money, and McGuire continued to hit him with the gun, calling out, ''Peggy, is this the man?'' Defendant Rosenfield then came to the door of the bedroom, looked at Payton and said, ''That's him.'' McGuire subsequently ransacked the apartment while the second man stood over Payton with a gun, but he was unable to find any money. McGuire then threatened to shoot Payton if he did not tell where the money was by the count of three. Both men pointed their guns at Payton, and at the count of two, he admitted that there was $76 on the shelf of the bedroom closet. McGuire then took the money, ordered Payton to pull the covers over his head and hit him again with the gun.

Payton feigned unconsciousness until he was sure that the robbers had left. He then arose from bed and found that a

glass panel in the door to the apartment had been broken and the glass pushed into the living room. He knocked on the door of a neighboring apartment and used the telephone to call the police.

Officer Sanders of the San Francisco Police Department arrived at Payton's apartment at 4:20 a.m. He observed that the lower panel in the door to the apartment had been broken. Various drawers in the apartment had been pulled out and clothing was strewn about. The bedclothing was bloody, and Payton was bleeding from the face and head. Payton was completely coherent and did not appear to be under the influence of alcohol. He furnished Sanders with descriptions of the three persons who had entered his apartment and was then taken to the hospital.

Defendants Rosenfield and McGuire both stipulated that they were present in Payton's apartment at the time of the alleged robbery and assault

The manager and assistant manager of an apartment building on Haight Street testified that defendant McGuire and a woman whom they identified as defendant Rosenfield, but who was known to them as Mrs. McGuire, rented an apartment in the building on July 16, 1964. On August 16, 1964, two days after the Payton robbery, defendant Rosenfield paid $150 as rent from that date until September 16, 1964.

The manager of the Algiers Motel in Los Angeles testified that defendant McGuire and a man who identified himself as Robert McGuire checked into the hotel on August 15, 1964, and checked out on August 21, 1964.

Both defendants testified in their own behalf. Defendant Rosenfield admitted that she had met Payton at the Booker T. Washington Hotel on the evening in question and had solicited him for an act of prostitution. However, she stated that they had agreed upon a price of $50 and that she had initially suggested that they go to a hotel around the corner from the Booker T. Washington. After they had driven to that hotel, Payton stated that he would prefer to go to his apartment, and she replied that since he was paying $50, she would go. When they arrived at his apartment, Payton paid her $10 in cash but promised to pay the rest by check and showed her his checkbook. She then stated that she would not accept a check, but Payton refused to take her back to the Booker T. Washington Hotel or to allow her to call a taxi. She ultimately agreed to accept the $10 and had intercourse with Payton. Upon completion of the act, he stated that he was not satisfied and wanted her to stay longer. He then went into the kitchen

to fix a drink, and defendant Rosenfield went out into the hall of the apartment building and knocked on the door of another apartment. Payton then forcibly pulled her back into his apartment, where he struggled with her and caused her to strike her head on the coffee table and lose her wig. Defendant Rosenfield had some $80 in currency concealed under the wig, and Payton took the money and refused to give it back to her. After he had forced her to have another act of intercourse with him, he drove her back to the corner of Webster and Ellis Streets. She thereafter borrowed cab fare from the clerk at the Booker T. Washington Hotel and returned to the Haight Street apartment which she shared with defendant McGuire when he was in town. McGuire returned to the apartment approximately ten minutes later and found her lying on the bed crying. After she told him what had happened, he drove her back to Payton's apartment for the purpose of recovering her money. They had no intention of using force upon Payton. and hoped that they could persuade him to return the money voluntarily.

Defendant Rosenfield stated that they knocked on the door of the apartment for approximately ten minutes, that Payton then opened the door and that she told McGuire that he was the man. McGuire then asked Payton why he had taken her money and beaten her up, but Payton denied that he had done so and began hitting McGuire. During the course of the fight which then ensued, Payton struck the door with an unspecified object which he was holding in his hand and broke the glass. Defendant Rosenfield did not see any gun. The two men ultimately stopped fighting, and she and McGuire left the premises without having recovered the money which Payton had taken from her. She denied that she ever entered the apartment during the fight and stated that she remained outside on the landing.

Defendant McGuire gave substantially the same version of the events which preceded his fight with Payton. He stated that the fight carried him on into the apartment and ultimately into the bedroom, where he knocked Payton unconscious on the bed. He was too frightened to think about taking any money and left in a hurry so that he would not be there when the police came. He denied ransacking the apartment and also denied that he had a gun. He had gone to the apartment for the sole purpose of asking Payton to return defendant Rosenfield's money.

McGuire admitted that he left San Francisco on August 15, 1964, and went to Los Angeles, where he met his brother and registered both of them at a motel for a period of several days. He subsequently returned to San Francisco, stayed only long enough to pick up his clothes, and then went to Seattle.

Two bail bondsmen testified that they had seen defendant Rosenfield on August 19, 1964, and had noticed that she had a black eye and a few facial abrasions.

After the defense had rested, the district attorney indicated, out of the presence of the jury, that she intended to produce evidence of another similar offense in order to rebut defendants' testimony that they had no intention of committing robbery when they entered Payton's apartment. After extended argument by counsel and a detailed offer of proof by the district attorney, a lineup was conducted for the purpose of determining whether the People's primary rebuttal witness, John Capiti, could identify defendant McGuire. When the witness had demonstrated his ability to do so, the court ruled that his testimony was admissible for the limited purpose of negating defendant's lack of specific intent in connection with the burglary charge, and the jury was so instructed.

Capiti then testified that on the evening of August 14, 1964, he entered a bar and struck up a conversation with defendant Rosenfield. In response to her invitation, he took her to his house and paid her $20 to commit an act of prostitution. He then allowed her to fix drinks while he turned on the radio. After he had almost finished his drink, he began to feel fuzzy, took off his coat and lay down. Capiti apparently lost consciousness at this point and recalled nothing until he awoke to find defendant McGuire hitting him about the head. Defendant Rosenfield and another man were also present. While the second man held his feet, McGuire continued to hit him and then shot him in the forearm. He recalled nothing more until he regained consciousness in the hospital. Although his wallet had contained $156 on the night of the assault, it contained only $1.71 when Capiti arrived at the hospital. Capiti was partially paralyzed as a result of the beating and was able to testify only with the aid of a speech therapist.

Police Officer Wader also testified for the prosecution on rebuttal. He had arrived at Capiti's apartment at approximately 7 a.m. on August 15, 1964. Capiti was lying in the kitchen and there was a considerable amount of blood in the kitchen sink and surrounding area. Two glass panels in the door to the apartment had been broken.

There was also evidence that a fingerprint found in Capiti's apartment was later identified as that of defendant Rosenfield.

Another police officer testified that he had seen defendant Rosenfield in the early morning of August 19, 1964, and had observed no black eye or facial injury.

In surrebuttal, the defense offered the testimony of two witnesses who were residents of Los Angeles and who had seen defendant McGuire in that city on the morning of August 15, 1964, and had noticed that his hands were swollen and that his face was swollen and cut.

Defendant McGuire then resumed the stand and testified that he left San Francisco to drive to Los Angeles at approximately 8:30 or 9 p.m. on August 14, 1964.

Defendants' primary contention on appeal is that the trial court committed prejudicial error in allowing the prosecution to introduce evidence concerning the Capiti robbery and assault. They argue that such evidence was not admissible against defendant Rosenfield because the Capiti and Payton incidents were too dissimilar to render evidence of the former incident relevant to the issue of intent. They contend that the evidence was inadmissible against defendant McGuire because he was never formally charged with having participated in the offenses involving Capiti, and those counts charging defendant Rosenfield with such participation had been severed for trial. Both defendants further assert that since the evidence pertaining to the Capiti incident was available to the prosecution when it presented its case in chief, it was error to allow the evidence to be used in rebuttal and the district attorney was guilty of misconduct in producing it at that time. We do not agree.

 It is the general rule in this state that a defendant can be tried only for the offense charged and that evidence of the commission of other offenses is not admissible because its prejudicial effect outweighs its probative value. (*People* v. *Westek* (1948) 31 Cal.2d 469, 476 [190 P.2d 9]; *People* v. *Cassandras* (1948) 83 Cal.App.2d 272, 279 [188 P.2d 546]; *People* v. *DeGeorgio* (1960) 185 Cal.App.2d 413, 418 [8 Cal. Rptr. 295].) This rule prohibits the introduction of evidence of other offenses to show that the accused is a bad person or is inclined toward the commission of crime. (*People* v. *Cook* (1905) 148 Cal. 334, 340 [83 P. 43]; *People* v. *Glass* (1910) 158 Cal. 650, 658 [112 P. 281].) However, this rule is subject to exceptions grounded upon principles of rele-

vancy and does not operate to exclude evidence of other crimes which tends logically, naturally, and by reasonable inference, to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense. (*People* v. *Peete* (1946) 28 Cal.2d 306, 314-315 [169 P.2d 924]; *People* v. *McCaughan* (1957) 49 Cal.2d 409, 421 [317 P.2d 974]; *People* v. *Ryerson* (1962) 199 Cal.App.2d 646, 651 [19 Cal.Rptr. 22]; *People* v. *Zankich* (1961) 189 Cal.App.2d 54, 62-64 [11 Cal.Rptr. 115].) ▆ Thus, a defendant's claim of innocent intent may properly be rebutted by evidence of similar, collateral offenses as to which the accused is connected by clear and convincing evidence. (*People* v. *Wade* (1959) 53 Cal.2d 322, 330-331 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Westek, supra,* at pp. 480-481; *People* v. *Mullinax* (1958) 165 Cal.App.2d 449, 453-454 [331 P.2d 1010]; *People* v. *Kinder* (1954) 122 Cal.App.2d 457, 464 [265 P.2d 24]; *People* v. *Zabel* (1950) 95 Cal.App.2d 486, 487-488 [213 P.2d 60].)[2] ▆ Although evidence of other crimes must be received with extreme caution, it is for the trial court in the exercise of its judicial discretion to determine whether the probative value of such evidence is outweighed by its possible prejudicial effect and to admit or exclude it accordingly. (*People* v. *Scott* (1963) 218 Cal.App.2d 249, 253 [32 Cal.Rptr. 225]; *People* v. *McCaughan, supra,* at pp. 421-422.)

▆ In the instant case, defendants' denial that they acted with felonious intent when they entered Payton's apartment made the issue of intent determinative of the question of their guilt or innocence on the burglary charge. The evidence of the Capiti incident was relevant for the purpose of rebutting their claim of innocent intent, and the court instructed the jury that the evidence could not be considered for any other purpose. Both defendants were positively identified by Capiti, and the Payton and Capiti incidents were markedly similar. In each instance, the victim encountered defendant Rosenfield in a bar, accepted her offer to commit an act of prostitution, and took her to his apartment for that purpose. Defendant Rosenfield subsequently left the apartment of each victim, returned with defendant McGuire and another man and obtained forcible entry to the apartment.[3] Both victims were

[2]*People* v. *Gibson* (1930) 107 Cal.App. 76 [289 P. 937], upon which defendants rely, is clearly not in accord with the more modern view expressed in the above-mentioned authorities.

[3]In attempting to distinguish the Payton and Capiti incidents, defendants place considerable emphasis upon the fact that Capiti lost consciousness while defendant Rosenfield was still in the apartment and was

thereafter severely beaten and robbed.

In view of the close similarity between the Capiti and Payton incidents and Capiti's positive identification of both defendants, the court did not abuse its discretion in admitting the evidence for the limited purpose of rebutting defendants' claim that they did not possess the specific intent required for the crime of burglary. ▇ It is equally apparent that the district attorney was not guilty of misconduct in failing to produce the evidence as part of the People's case in chief and in using such evidence to rebut defendants' claim of innocent intent.

▇ Defendants next contend that the trial court erred by prefacing its instructions to the jury with comments to the effect that certain testimony given by Payton was irreconcilable with that given by defendant Rosenfield, that both witnesses could not be telling the truth as to the facts in dispute and that the jury would have to decide for itself whether Payton did or did not struggle with defendant Rosenfield and rob her of the money concealed in her wig. Defendants assert that the effect of these comments was to eliminate the requirement that the prosecution prove its case beyond a reasonable doubt and to reduce the burden of proof to a ''50-50 proposition.'' This contention cannot be sustained.

The record reveals that the trial court properly instructed the jury relative to the prosecution's burden of proving defendants' guilt beyond a reasonable doubt. The comments of which defendants complain obviously constituted the statement of a harmless truism; no juror could conceivably have been under the impression that Payton and defendant Rosenfield were both telling the truth with regard to certain of the events which occurred during her initial visit to his apartment. In view of the other instructions given, the comments in question could not have led the jurors to believe that the prosecution was relieved of the burden of proving its case beyond a reasonable doubt.

▇ Defendants also assert that the trial court misstated the evidence to their detriment by (1) informing the jury that Capiti and Payton were both beaten in bed, whereas the blood-

---

therefore unable to testify that she left the apartment and later returned with defendant McGuire and the other man. However, the evidence that two glass panels in the outer door of the apartment had been broken clearly shows that she did in fact leave the Capiti apartment and return with the two men. If she had remained in the apartment, as defendant suggests, there obviously would have been no need for the two men to break the door in order to gain admittance.

stains in Capiti's apartment indicated that he had actually been beaten in the kitchen, and (2) informing the jury that one of the two alibi witnesses who testified for defendant McGuire on surrebuttal had met him in Los Angeles at 12:30 p.m. on August 15, whereas she actually testified that she met him shortly before noon on that day.

Defendants failed to object to either misstatement of the evidence, hence they clearly fall within the rule that a party may not complain on appeal of the trial court's misconduct unless he has given the trial court an opportunity to correct the error or false impression. (*People* v. *Cheary* (1957) 48 Cal.2d 301, 316 [309 P.2d 431]; *People* v. *Cole* (1960) 177 Cal.App.2d 458, 461-462 [2 Cal.Rptr. 190].) We are satisfied, however, that neither misstatement of the evidence could have resulted in genuine prejudice to defendants. The fact that Capiti was assaulted in the kitchen of his apartment rather than in his bed obviously did not detract in any appreciable degree from the marked similarity between the Capiti and Payton incidents. Of even less significance is the one-half hour discrepancy in the time when defendant McGuire allegedly encountered one of his two alibi witnesses in Los Angeles. The crucial alibi evidence, which was not materially misstated by the court, was furnished by McGuire's other alibi witness, who had allegedly met him in Los Angeles at 7 a.m. on August 15.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 17, 1966. Peters, J., was of the opinion that the petition should be granted.